KAREN A. OVERSTREET
United States Bankruptcy Judge
United States Courthouse
700 Stewart St., Suite 6310
Seattle, WA 98101
206-370-5330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 |
| ROSEMARY H. KAMB, | ) | |
| | ) | |
| Debtor. | ) | Bankruptcy No. 11-13856 |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| ESTATE OF LYDE L. HERRLE, | ) | Adversary No. 11-01380 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | |
| ROSEMARY H. KAMB, | ) | (Not for Publication) |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

The trial in this matter commenced on August 31, 2011. The Plaintiff, Estate of Lyde L. Herrle, ("Estate" or "Plaintiff") and Defendant, Rosemary H. Kamb, ("Ms. Kamb" or "Defendant") appeared through counsel. This Memorandum Decision contains the Court's findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052.[1] Jurisdiction of this matter is proper under 28 U.S.C. §§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

───────────────

[1]  Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

MEMORANDUM DECISION - 1

Having considered the evidence, the Court finds in favor of the Defendant and any obligation she owes to Plaintiff should be discharged.

## I.  BACKGROUND

Plaintiff brings this matter under Sections 523(a)(4) and (a)(6) to except from discharge a debt in the amount of approximately $350,000 arising from a loan made by Plaintiff to Ms. Kamb.  The Court denied Plaintiff's Motion for Summary Judgment on the Section 523(a)(4) claim, concluding that there was a dispute of fact as to whether, at the time the loan was made, Ms. Kamb was acting as a fiduciary for the Estate.  Plaintiff contended that at the time, Ms. Kamb was acting as the attorney for the Estate.  The issues for trial were (1) whether Ms. Kamb was acting as a fiduciary for the Estate at the time the debt was incurred for purposes of Section 523(a)(4), and (2) whether the debt should be excepted from discharge under Section 523(a)(6).

## II.  FINDINGS OF FACT

Ms. Kamb is a lawyer who represented Lyde L. Herrle in estate planning matters.  On August 6, 2008, Lyde Herrle executed a will (the "2008 Will") and complete amendment to the Lyde Herrle Trust (the "Trust"). Both documents were drafted by Ms. Kamb.  The 2008 Will named Marie Kunferman, Lyde Herrle's then 93 year-old sister, as the personal representative.  It further provided that any assets in Mr. Herrle's estate would pour over into the Trust. Plaintiff's Exhibit 1 (hereinafter "Pl. Ex.")  The Trust named Ms. Kunferman as the trustee and the Immaculate Conception Church, Immaculate Conception School, and ICRS Scholarship Program as the primary beneficiaries.  Pl. Ex. 2, page 14.  The Trust also

MEMORANDUM DECISION - 2

contained some special bequests, including a direction that Mr. Herrle's house and farm be distributed to his niece, Connie Marich. Ms. Kamb drafted another amendment to the Trust in 2008 which expressed Mr. Herrle's intent that none of the Trust assets be used by Immaculate Conception Church to build a new church. Pl. Ex. 3.

On January 2, 2010, Mr. Herrle executed another will drafted by Ms. Kamb (the "2010 Will"), which was much like the 2008 Will, in that it named Ms. Kunferman as the personal representative and provided that any assets in Mr. Herrle's estate would pour over into the Trust. Pl. Ex. 5. At the same time, Mr. Herrle also executed a second amendment to the Trust (the "Second Amendment") which was also drafted by Ms. Kamb. The Second Amendment clarified that the Immaculate Conception (Regional) School Endowment or Foundation and scholarship program for Immaculate Conception (Regional) School tuition were the primary beneficiaries. Pl. Ex. 6, pages 2-3.

On February 6, 2010, Mr. Herrle executed a third amendment to his Trust (the "Third Amendment") drafted by Mr. Kamb. Under the Third Amendment, Ms. Kamb was named the trustee under the Trust, replacing Ms. Kunferman. Pl. Ex. 8, page 1. The Third Amendment recites the reason for the change, stating that:

> I [Lyde Herrle] do not want Marie [Ms. Kunferman] to be put in the middle of my affairs. I do not like what this business has done to make her worry. That is why I asked Rosemary Kamb to be in charge.

Pl. Ex. 8, page 3. The Third Amendment was witnessed by Ms. Kamb's mother, Wilma Kamb, and by Ms. Kamb's brother, Michael Kamb, and notarized by Ms. Kamb.

MEMORANDUM DECISION - 3

1  Additionally, the Third Amendment removed the distribution of

2  Mr. Herrle's house and farm to his niece, Connie Marich.  Instead,

3  the Third Amendment recites that Mr. Herrle's relationship with

4  Mrs. Marich's husband had become strained and that Mr. Herrle had

5  decided to sell his house and farm to Robert Jungquist and retain a

6  life estate in the property.  Pl. Ex. 8, page 3.  Ms. Kamb

7  testified that at the time she prepared the Third Amendment, she

8  was the attorney for Mr. Herrle, the Estate and the Trust, and for

9  Ms. Kunferman as to her personal matters.

10  On February 23, 2010, Lyde Herrle passed away.

11  By order dated March 2, 2010 (the "Suspension Order"), the

12  Washington Supreme Court suspended Ms. Kamb from the practice of

13  law for a period of one year commencing on March 9, 2010.  Pl. Ex.

14  10.  The Suspension Order approved a stipulation entered into

15  between Ms. Kamb and the disciplinary counsel of the Washington

16  State Bar Association on November 10, 2009, pursuant to which

17  Ms. Kamb had agreed to a one-year suspension.  Thus, she knew in

18  late 2009 that if the stipulation was ultimately approved by the

19  Washington Supreme Court, she likely would be subject to at least a

20  one-year suspension. Pl. Ex. 4 at ¶55.  At no time prior to March

21  9, 2010, did Ms. Kamb notify Mr. Herrle or Ms. Kunferman orally or

22  in writing of her likely suspension.

23  Following her suspension, Ms. Kamb drafted a Notification and

24  Acknowledgment letter for Marie Kunferman to sign (the

25  "Acknowledgment").  Defendant's Exhibit 102 (hereinafter "Def.

26  Ex.").  The Acknowledgment states that Ms. Kamb would not be able

27  to act in any professional capacity as an attorney and that if the

28  Trust and/or Estate had the need to hire an attorney, Ms. Kamb

MEMORANDUM DECISION - 4

could not be that attorney. The Acknowledgment further states that Ms. Kamb has Ms. Kunferman's permission to act as trustee of the Trust in her individual capacity, "but not as an attorney." *Id*. The Acknowledgment is dated March 11, 2010, and although it is not witnessed or notarized, Ms. Kunferman testified that her signature appears on the document. Ms. Kunferman, who was 96 at the time of trial, could not remember the circumstances under which she signed the Acknowledgment nor could she say that she understood what it meant. The Acknowledgment does not refer to the suspension nor was there any evidence that Ms. Kamb ever advised Ms. Kunferman orally or in writing of the suspension after it became effective.

A week before the date of the Acknowledgment, Ms. Kunferman signed Record and Information Release Authorization letters, as successor trustee under the Trust and as personal representative of the Estate, authorizing various entities, including without limitation, Bank of America and Sun Life Financial, to deal directly with Ms. Kamb, the "Trustee of the Lyde L. Herrle [sic]," and giving Ms. Kamb, or any authorized person, permission to access any and all financial information, such as estate planning documentation, financial records, and investment and retirement documentation, pertaining to Mr. Herrle. *See* Pl. Exs. 30-35.

Ms. Kamb testified that in March of 2010, on account of a "hate crime" affecting her residence, she decided she needed to move from her residence. On March 29, 2010, she signed a purchase and sale agreement with Janice Otto to purchase property located at 17269 Lake View Boulevard, Mt. Vernon, Washington (the "Lakeview Property") for a purchase price of $350,000. Pl. Ex. 53. Although Ms. Kamb testified that she believed the agreement had a financing

MEMORANDUM DECISION - 5

contingency clause, the agreement does not contain such a clause.
*Id.* The agreement provided for a closing date of May 31, 2010.

On March 31, 2010, two days after Ms. Kamb committed herself to purchase the Lake View Property, Ms. Kamb left on a boat cruise with Ms. Kunferman, Ms. Kamb's sister, Elizabeth Mitchell, Ms. Kamb's son, and Ms. Kamb's parents. They did not return from the cruise until April 10, 2010. Def. Ex. 124. The day after they left, however, papers arrived at the Superior Court for Skagit County which were intended to, and did, commence the probate of Mr. Herrle's estate. The papers consisted of a Petition for Probate of Will (the 2008 Will) and an Oath of Executor. Pl. Ex. 11. Both documents were signed by Ms. Kunferman, as personal representative, and notarized by Kimberly Buchanan on March 29, 2010. Ms. Kamb and Ms. Kunferman denied that either of them filed the probate documents with the Superior Court. There was, however, a letter to the Court Clerk for Skagit County submitted with the probate documents, which enclosed a check for $256.00 from Ms. Kunferman. Pl. Ex. 55. Ms. Kamb further testified that she did not know who Ms. Buchanan was, and that she had never used Ms. Buchanan as a notary. The Superior Court issued Letters Testamentary to Ms. Kunferman on April 5, 2010. Pl. Ex. 27.

On April 12, 2010, Lawrence Pirkle, attorney for Kenneth Jungquist, sent a letter to Ms. Kamb which enclosed a revised Purchase and Sale Agreement concerning the sale of Mr. Herrle's property. Pl. Ex. 13. Mr. Pirkle testified at trial that he had engaged in discussions with Ms. Kamb regarding the sale of this property before and after Mr. Herrle died. He testified that he had a conversation with Ms. Kamb on or about April 8, 2010,

MEMORANDUM DECISION - 6

discussing closing matters for the sale of this property, and that Ms. Kamb communicated to Mr. Pirkle that she would have to discuss these matters with her client, which Mr. Pirkle believed was Ms. Kunferman. Ms. Kamb denied this conversation and testified that on April 8, she was still on the cruise with Ms. Kunferman.

Four days after returning from the cruise, Ms. Kunferman, as personal representative of the Estate, signed the agreement for the sale of Mr. Herrle's house and farm to Kenneth Jungquist, Robert Jungquist's son, for a purchase price of $355,000. Pl. Ex. 40. She initialed two changes to the agreement: (1) changing the closing date to April 30, 2010, and (2) changing the date for a change of possession of the house to 60 days after closing. The sale closed on or about April 20, 2010.

On April 26, 2010, Ms. Kamb signed a resignation as the trustee for the Trust, which purports to give all powers to the successor trustee, Ms. Kunferman. Def. Ex. 101. The resignation was notarized by Jessica Arnold that same day, but it was not filed with the trust records. *See* RCW 11.98.029, 11.98.041.

In the March and April 2010 time frame, Ms. Kamb unsuccessfully sought financing to complete her purchase of the Lake View Property. Ms. Kamb testified that during this same time frame, she and Ms. Kunferman agreed that Ms. Kunferman would loan the Estate's proceeds from the sale of Mr. Herrle's house and farm to Ms. Kamb subject to a long term pay back at 5% interest so that Ms. Kamb could close the purchase of the Lake View Property. At that time, in addition to her residence in Mt. Vernon, Washington, Ms. Kamb owned real property in Burlington and in Anacortes,

MEMORANDUM DECISION - 7

Washington.  Ms. Kunferman denied that she had ever agreed to make

a loan of the Estate's funds to Ms. Kamb.

On May 21, 2010, Ms. Kunferman paid Ms. Kamb $10,000 in two

checks drawn on the Estate's account for what she testified was a

"fee" for "all of the work" that Ms. Kamb was doing for her and the

Estate. Pl. Exs. 47, 48.  Also on that day, $375,000 of the

Estate's funds, including the proceeds of the sale of Mr. Herrle's

property to Mr. Jungquist, were paid to Land Title Company.  These

funds were then loaned to Ms. Kamb pursuant to two promissory

notes, which Ms. Kamb executed in favor of the Estate on or about

June 2, 2010.  One promissory note was in the amount of $250,000

payable over 35 years with 5% interest per annum and was secured by

a deed of trust signed by Ms. Kamb on June 4, 2010 on the Lake View

Property.  Pl. Ex. 17.  Because Ms. Otto, the seller, had financed

$100,000 of the purchase price and taken a deed of trust against

the Lake View Property to secure that loan (Pl. Ex. 16), there is a

Subordination Agreement signed on June 4, 2010, by Ms. Kunferman on

behalf of the Estate, subordinating the Estate's deed of trust to

Ms. Otto's deed of trust.  Ms. Kamb executed a second promissory

note on behalf of the Aargh Family Limited Partnership which note

was in the amount of $125,000 and payable to the Estate over 35

years with 5% interest per annum.  The note was secured by a deed

of trust on the Anacortes property, which was held in the name of

the Aargh Family Limited Partnership, of which Ms. Kamb was the

general partner.  *See* Pl. Exs. 17 and 19.  The Estate's deed of

trust against the Anacortes Property was junior to an existing deed

of trust on the property.

MEMORANDUM DECISION - 8

Ms. Kamb testified that before the loan closed, she explained the terms of the loans to Ms. Kunferman, advised her of the risks of subordination to Ms. Otto's loan, and provided information concerning the rents she was receiving from her other properties. She did not tell Ms. Kunferman, however, that she had been suspended from the practice of law for a year and therefore would not have income from that source. The loan transactions closed on or about June 4, 2010. Funds in the amount of $375,000 were disbursed for Ms. Kamb's benefit as follows: $250,000 was used to fund Ms. Kamb's downpayment on her purchase of the Lake View Property; closing costs related to the Lake View Property sale were paid; $14,800 in "additional disbursement" were paid, including a $7,718.19 tax debt owed by Ms. Kamb; and the balance of just under $100,000 was paid to Ms. Kamb. Pl. Ex. 52, p. 266; Pl. Ex. 42.

At trial, Ms. Kamb testified that it was Ms. Kunferman who suggested that the Estate loan the funds to Ms. Kamb after the two had discussed the need for Ms. Kamb to move from her existing residence. Ms. Kamb further testified that Land Title Company prepared the deeds of trust and promissory notes. To provide background on the reason for transferring the funds to Land Title, Ms. Kamb drafted a letter, which was addressed to Land Title Company and signed by Ms. Kunferman. Def. Ex. 110. The letter purports to explain why the terms of the loan were made, the actual terms of the loans, that Ms. Kamb was not acting as a lawyer, and that all of the paperwork pertaining to the promissory notes and deeds of trust could be done through Land Title Company. The letter further states that the 5% interest on the loans will provide "the school" (*i.e.* Immaculate Conception (Regional) School)

MEMORANDUM DECISION - 9

a monthly payment as Mr. Herrle wanted pursuant to his Trust.
Ms. Kunferman admitted that she signed the letter, but denied that
she typed it and she could not remember any conversations with
Ms. Kamb about the loans.

Following Ms. Kamb's execution of the promissory notes, on or
about June 9, 2010, contract collection agreements were prepared
and new accounts were created with Whidbey Island Bank to set up
monthly contract collection of Ms. Kamb's payments on both the
$250,000 and $125,000 promissory notes.  Def. Exs. 104 and 105.
Ms. Kamb signed these agreements on her own behalf and
Ms. Kunferman signed on behalf of the Estate.  Kim Raymond, a
representative from Whidbey Island Bank, also signed the agreement.
Ms. Kamb testified that these collection accounts were set up to
ensure that payments on the promissory notes were being made and
that the payments would ultimately go to the Immaculate Conception
(Regional) School, as the beneficiary of the Trust.

At trial, Ms. Kunferman verified her signature on the various
documents admitted into evidence, including without limitation, the
Acknowledgment (Def. Ex. 102), the letter to Land Title Company
(Def. Ex. 110), the probate documents filed with the Superior
Court, the sale agreement for Mr. Herrle's property, and promissory
notes.  However, Ms. Kunferman could not remember any specific
details about the transactions or the contents of the documents nor
could she remember the circumstances under which she signed these
documents, except to say that she trusted Ms. Kamb and signed
whatever Ms. Kamb asked her to sign.  She was insistent that the
Estate had not loaned any money to Ms. Kamb.  Ms. Kunferman was 96

MEMORANDUM DECISION - 10

years old at the time of trial and struggled to recall the many
events and transactions that occurred.

At some point in September 2010, Ms. Kunferman or the
Immaculate Conception Church became concerned about the loans to
Ms. Kamb and Ms. Kunferman filed a petition with the Superior Court
of Skagit County to remove Ms. Kamb as the trustee of the Trust on
October 29, 2010. The Superior Court issued an order on
November 22, 2010, removing Ms. Kamb as the trustee of the Trust,
ordering Ms. Kamb to repay all of the funds borrowed from the
Estate with interest, authorizing the issuance of a prejudgment
writ of attachment against all of Ms. Kamb's real and personal
property, and appointing Ms. Kunferman as the successor trustee
under the Trust. Pl. Ex. 24.[2] Pursuant to the order, the Superior
Court found that Ms. Kamb failed to adequately disclose to
Ms. Kunferman the terms and risks of the transactions, and that
Ms. Kamb failed to obtain Ms. Kunferman's informed consent in
writing to the transactions. The court did not specifically find,
however, that Ms. Kamb had violated a fiduciary duty to the Trust
or that when the Estate's funds were loaned to her, she was acting
as an attorney for the Estate.[3] In May of 2011, at the urging of
the Immaculate Conception Church, Ms. Kunferman agreed to permit
John Lee, a member of the church's finance committee and its

_____

[2] According to Def. Ex. 101, Ms. Kamb had already resigned as
the Trustee in April 2010, however, it was not clear from the
testimony when Ms. Kunferman learned of that resignation or whether
the resignation complied with the requirements of Washington state
law.

[3] In fact, language stating that after Ms. Kamb was suspended
from the practice of law she continued to represent the Estate as
its attorney was crossed out in the court's order.

MEMORANDUM DECISION - 11

endowment board, to take her place as the trustee under the Trust. Mr. Lee testified that Ms. Kamb made three or four payments on each of the notes before she defaulted and that she currently owed the Estate a total of $350,000. He also testified that a receiver has been appointed to take control of and liquidate Ms. Kamb's real properties, but there was no evidence that the receiver has been able to liquidate any of those properties. Nor was any competent valuation testimony offered as to the properties.

Ms. Kamb filed a petition for relief under Chapter 7 on April 1, 2011. The Court granted relief from stay to permit the receiver to carry out the terms of the superior court's order on June 3, 2011. Dkt. 21. Case No. 11-13856. The Estate timely filed this action to except its claim against Ms. Kamb from discharge.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court makes the following conclusions of law. The plaintiff has the burden of proving each element of Section 523 by a preponderance of the evidence. *Grogan v. Garner*, 298 U.S. 279 (1991). Exceptions to discharge are to be construed strictly against the objecting creditor and liberally in favor of the debtor. *Eisen, et al. v. Linn, (In re Linn)*, 38 B.R. 762 (9th Cir. BAP 1984).

**A.      Section 523(a)(4) - Fraud While Acting as a Fiduciary.**

1.      Fiduciary Capacity.

Section 523(a)(4) excepts from discharge debts that arise from "fraud or defalcation while acting in a fiduciary capacity . . . ." To prevail on a nondischargeability claim under Section 523(a)(4), the plaintiff must prove not only the debtor's fraud or

MEMORANDUM DECISION - 12

defalcation, but also that the debtor was acting in a fiduciary

capacity when the debtor committed the fraud or defalcation. *See*

*Teichman v. Teichman (In re Teichman),* 774 F.2d 1395, 1398 (9th

Cir. 1985); and *Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1057

(9th Cir. 1994). Defalcation is defined as the misappropriation of

trust funds or money held in any fiduciary capacity or the failure

to account for such funds. *Stephens v. Bigelow (In re Bigelow)*,

271 B.R. 178, 186 (9th Cir. BAP 2001), *citing Lewis v. Scott (In re*

*Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996). To prove fraud or

defalcation while acting in a fiduciary capacity, a plaintiff must

show that the defendant was a fiduciary to whom funds were

entrusted. The burden then shifts to the fiduciary to account

fully for all funds received for the plaintiff's benefit by

establishing that she complied with her fiduciary duties as to all

questioned transactions.

The broad definition of fiduciary under nonbankruptcy law - a

relationship involving trust, confidence, and good faith - is

inapplicable in the dischargeability context. *Cal-Micro, Inc. v.*

*Cantrell (In re Cantrell),* 329 F.3d 1119, 1125 (9th Cir. 2003).

For purposes of Section 523(a)(4), the Ninth Circuit has adopted a

narrow definition of "fiduciary." To fit within Section 523(a)(4),

the fiduciary relationship must be one arising from an express or

technical trust that was imposed before, and without reference to,

the wrongdoing that caused the debt as opposed to a trust *ex*

*maleficio*, constructively imposed because of the act of wrongdoing

MEMORANDUM DECISION - 13

from which the debt arose.[4]  *Cantrell,* 329 F.3d at 1125, *citing Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1185 (9th Cir. 1996). The meaning of "fiduciary" under Section 523(a)(4) is an issue of federal law.  However, courts must look to state law to determine whether the requisite trust relationship exists.

In Washington, a fiduciary relationship arises as a matter of law between an attorney and his or her client.  *Liebergesell v. Evans*, 93 Wash.2d 881, 890, 613. P.2d 1170, 1176 (1980).  This fiduciary relationship, however, while it meets the broad definition of a fiduciary under state law, does not, without more, satisfy the more narrow federal definition.  *Bigelow*, 271 B.R. at 187.  Nondischargeability based upon an attorney client relationship is usually reserved for those situations where money or property has been entrusted to the attorney-debtor.  Thus, a general fiduciary attorney-client relationship may rise to the level of a fiduciary relationship for purposes of Section 523(a)(4) if there are client trust funds involved.  In such cases, where the debt arises out of the attorney's mishandling of the client's funds that are placed into a trust account the debt will be nondischargeable.  *Id.* at 187. *See also Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 871 (9th Cir. 2001).

2.  <u>The Attorney-Client Relationship</u>.

Under the foregoing authorities, the Court must first determine whether an attorney-client relationship existed between

---

[4] "The general characteristics of an express trust are (1) sufficient words to create a trust, (2) a definite subject and (3) a certain and ascertained object or res."  *Bigelow*, 271 at 187 (9th Cir. BAP 2001), *citing Lovell v. Stanifer (In re Stanifer)*, 236 B.R. 709, 714 (9th Cir. BAP 1999).

MEMORANDUM DECISION - 14

1    Ms. Kamb and the Estate.  Under Washington law, "The essence of the

2    attorney client relationship is whether the attorneys' advice or

3    assistance is sought and received on legal matters." *Bohn v. Cody*,

4    119 Wash.2d 357, 363, 832 P.2d 71, 75 (1992).  The existence of the

5    relationship is based "largely on the client's subjective belief

6    that it exists." *In re McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d

7    1330, 1334 (1983).  This belief controls the issue if it is

8    reasonably based on the factual circumstances, including the

9    attorneys' words or actions. *Bohn*, 119. Wash.2d at 363.  Courts

10   have held that "once established, a lawyer-client relationship does

11   not terminate easily.  Something inconsistent with the continuation

12   of the relationship must transpire in order to end the

13   relationship." *Jones v. Rabanco, Ltd.*, 2006 WL 2237708 (W.D. Wash.

14   2006).

15        There is no dispute that Ms. Kamb represented Mr. Herrle, his

16   Estate and Ms. Kunferman in estate planning matters prior to

17   March 9, 2010.[5]  Ms. Kamb argues that because she was suspended

18   from practice after that date, and thus was not authorized to

19   practice law, she could not have been acting as the attorney for

20   the Estate.  The Court disagrees.  If she continued to provide

21   advice and assistance to the Estate with regard to legal matters,

22   albeit in contravention of state law, under the authorities cited

23   above, the Court would nonetheless find the existence of an

24   attorney-client relationship.

25

26   _____

27        [5]In fact, there was a long history of legal representation as
     Ms. Kamb's grandfather was an attorney for Ms. Kunferman and
     Mr. Herrle, and Ms. Kamb's father was an attorney for one of
28   Mr. Herrle's brothers.

MEMORANDUM DECISION - 15

After Ms. Kamb's suspension became effective in March 2010, Ms. Kunferman signed multiple documents explicitly stating that Ms. Kamb was no longer practicing law, nor acting as an attorney. Specifically, Ms. Kunferman signed the Acknowledgment, which states clearly that any actions taken by Ms. Kamb were in her individual capacity and not as a practicing attorney or any other kind of professional, and she signed a letter addressed to Land Title Company which reiterated the same disclaimer. Although Ms. Kamb never told Ms. Kunferman that the reason she was no longer practicing law was because she had been suspended, the fact remains that Ms. Kamb provided written statements to Ms. Kunferman stating that she would not be acting in the capacity as an attorney as of March 2010.

Plaintiff maintains that despite these disclaimers, Ms. Kamb was still its attorney because Ms. Kunferman had the subjective belief that an attorney-client relationship existed between Ms. Kamb and the Estate because Ms. Kamb continued to assist Ms. Kunferman with the Estate's legal matters. Plaintiff argues that Ms. Kamb provided legal assistance by filing the probate documents with the Skagit County Superior Court on behalf of the Estate. However, Ms. Kamb testified that she did not file the probate documents with that court and that when the filing occurred, she was on a cruise with Ms. Kunferman. Plaintiff's Ex. 55 suggests that the filing occurred by mail and that the mailing was done by Ms. Kunferman as her personal check for the filing fee accompanied the documents. Plaintiff maintains that Ms. Kamb continued to represent the Estate in connection with the sale of Mr. Herrle's property to Mr. Jungquist even after her suspension.

MEMORANDUM DECISION - 16

Ms. Kamb testified that she had drafted the initial purchase and sale agreement before Mr. Herrle's death. According to Mr. Pirkle, he redrafted the agreement and his version was the final agreement executed. Mr. Pirkle testified that he spoke with Ms. Kamb about the sale around April 8, 2010. Ms. Kamb was on a cruise, however, and testified that she did not speak to Mr. Pirkle at that time.

Plaintiff argues that Ms. Kunferman's belief that Ms. Kamb continued to act as the Estate's attorney is evidenced by the Estate's check in the amount of $10,000 paid to Ms. Kamb in May of 2010 for what Ms. Kunferman testified was the work that Ms. Kamb had been doing. Pl. Ex. 42. The check, however, indicates that it was paid in connection with Ms. Kamb's purchase of the Lake View Property and does not recite that it is a payment for legal services. Plaintiff also argues that Ms. Kamb drafted the deeds of trust, promissory notes and subordination agreement she signed in connection with the loans given to the Estate. The testimony at trial, however, showed that it was in fact Land Title Company which provided these documents. Moreover, if Ms. Kamb had drafted these documents, that alone, would not prove that an attorney-client relationship existed. An attorney-client relationship is not created merely because an attorney prepares documents formalizing a transaction that affects an individual. *Bohn*, 119 Wash.2d at 364. Finally, Plaintiff points out that Ms. Kamb prepared an inventory of assets for the Estate and did so as its attorney because preparation of this type of document was the kind of estate planning work she would typically have done for her clients. Ms. Kamb conceded that she did prepare the inventory, but argues that she did it as a friend to Ms. Kunferman. While it is not

MEMORANDUM DECISION - 17

entirely clear in what capacity Ms. Kamb was acting when she
drafted the inventory, this inventory cannot be the sole basis for
concluding that Ms. Kamb was acting as an attorney during the
relevant period of time.[6]

From the totality of the evidence, the Court is not persuaded
that Ms. Kamb continued to provide legal advice to the Estate after
her suspension.  Additionally, it is important to note that there
is no evidence showing that Ms. Kunferman sought legal advice from
Ms. Kamb pertaining to the specific loan transactions that are the
basis for the Plaintiff's claim.  It was apparent from the
testimony that Ms. Kunferman trusted Ms. Kamb and that they were
close personal friends.  Their families had known each other for
years.  But, the existence of a trusting relationship is not
tantamount to an attorney-client relationship.  Thus, the Court
cannot find that an attorney-client relationship existed between
Ms. Kamb and the Estate at the time the loans by the Estate to
Ms. Kamb were made.

3.  The Existence of a Trust.

Alternatively, even if an attorney-client relationship existed
between the Estate and Ms. Kamb at the time the debt was incurred,
Plaintiff failed to show the existence of the kind of trust
required under Section 523(a)(4).  Under Section 523(a)(4), the
debtor must have been a trustee in the strict or narrow sense
pursuant to an express or technical trust.

In this case, there was no express or technical trust under

---

[6]  The Court agrees with Plaintiff that this inventory was
prepared at or around the time the loan transactions occurred
because the inventory describes the two promissory notes that
Ms. Kamb executed in favor of the Estate.

MEMORANDUM DECISION - 18

which Ms. Kamb was acting as a trustee. Ms. Kamb had no express obligation to keep the funds loaned to her separate from her own money, or to hold the funds in trust for the Estate. The Estate loaned the funds to Ms. Kamb so that Ms. Kamb could purchase real property, which she did. There were no restrictions placed on how the loan proceeds were to be used by Ms. Kamb, other than the obligation to pay interest and to return the principal pursuant to the terms of the notes.

Plaintiff relies on *Banks v. Gill Distribution Centers* in support of its contention that when a client's funds are involved, an attorney becomes a fiduciary with regard to those funds under Section 523(a)(4). In *Banks*, however, client funds from a settlement were deposited into the defendant-attorney's trust account. The court held that once the attorney placed his client's funds into his trust account, those funds became a trust *res* and he became his client's fiduciary for purposes of section 523(a)(4). *Banks*, 263 F.3d at 871.

The funds loaned by the Estate to Ms. Kamb were not deposited into her trust account or paid to her to be held in trust for the Estate. There was no evidence of an intent to create a trust nor were any trust-like duties imposed on Ms. Kamb. Instead, the evidence proved that Ms. Kunferman was seeking to make an investment of the funds on behalf of the Estate. It may not ultimately have been a wise investment of the funds, but the Court finds it was not a transaction in which Ms. Kamb was a fiduciary within the meaning of Section 523(a)(4).

Whether Ms. Kamb's borrowing of funds from the Estate was a violation of her duties under the Washington's Rules of

MEMORANDUM DECISION - 19

1  Professional Conduct is not the question here.  In the absence of
2  any requirement to segregate the funds obtained or otherwise
3  provide that the funds were to be held in trust, this court can
4  only conclude that the arrangement between Ms. Kamb and the Estate
5  was no more than that of debtor and creditor.

6       Because Ms. Kamb was not acting in a fiduciary capacity for
7  purposes of Section 523(a)(4), the Plaintiff is not entitled to a
8  judgment of nondischargeability under that section.[7]

9  **B.    Section 523(a)(6) - Conversion, Malicious Injury.**

10      Plaintiff also contends that the debt is nondischargeable
11  under Section 523(a)(6).  Proof of a cause of action under Section
12  523(a)(6) requires a two step process.  First, plaintiff must prove
13  that Defendant committed a "willful" injury.  *Khaligh v. Hadaegh*
14  *(In re Khaligh)*, 338 B.R. 817, 831 (9th Cir. BAP 2006).  To satisfy
15  the willfulness element, a creditor must prove that the debtor
16  deliberately or intentionally injured the creditor, and that in
17  doing so, the debtor intended not just to commit the act itself,
18  but also intended the consequences of the act.  *See Kawaauhau v.*
19  *Geiger*, 523 U.S. 57, 61-62 (1998).  Further, the Court must apply a
20  subjective test in determining the debtor's intent.  "[Section]
21  523(a)(6) renders a debt nondischargeable when there is either a
22  subjective intent to harm, or a subjective belief that harm is
23  substantially certain."  *Carillo v. Su (In re Su)*, 290 F.3d 1140,
24  1144 (9th Cir. 2002).

---

26  [7]  It should be noted that at no time was Ms. Kamb ever the
personal representative under any of Mr. Herrle's wills.  Instead,
27  her fiduciary duty was as the trustee under the Trust until she
resigned from that duty.  Plaintiff never argued that the proceeds
of the sale of Mr. Herrle's house and farm belonged to the Trust
28  nor is the Trust a plaintiff in this action.

MEMORANDUM DECISION - 20

The second step in the Section 523(a)(6) analysis is to determine whether the debtor's conduct was "malicious." *Kaligh*, 338 B.R. at 831. In order to be found malicious, the debtor must have committed a (1) wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which is done without just cause or excuse. *Id*. The last element, whether the act was done without just cause or excuse, presents a mixed question of law and fact. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105-06 (9th Cir. 2005), *cert. denied* 125 S.Ct. 2964 (2005). Evidence of specific intent to injure can negate just cause or excuse. *Khaligh*, 338 B.R. at 831.

Plaintiff argues that Ms. Kamb's conduct was willful and malicious and her debt to the Estate should not be discharged. Specifically, Plaintiff asserts that malice is shown by Ms. Kamb's manipulation of Ms. Kunferman, an elderly woman, to use the Estate's funds to make a loan to Ms. Kamb. Despite these assertions, however, Plaintiff failed to convince the Court that such manipulation actually occurred or that Ms. Kamb intended to harm the Estate. Third parties at Whidbey Island Bank and Land Title were involved and familiar with many of the transactions that took place during the relevant time period, yet none were called to testify that Ms. Kunferman was incompetent at the time the Estate loaned funds to Ms. Kamb. And, although Ms. Kunferman had trouble remembering events when she testified, the Court did not find her lacking in mental competence.

Finally, Plaintiff failed to quantify its injury. The Plaintiff has relief from stay to foreclose its interest in the properties securing the promissory notes. There was no evidence

MEMORANDUM DECISION - 21

presented that there will not be sufficient collateral ultimately
to cover the debt.

Accordingly, I conclude that Plaintiff has not met its burden
of showing the debt nondischargeable under Section 523(a)(6).

## CONCLUSION

For the reasons stated, the Court finds that Plaintiff has not
proved a case under either Section 523(a)(4) or (a)(6), therefore
the debts which are the subject of these proceedings are
dischargeable in bankruptcy.  Defendant may present an Order and
Judgment in accordance with this decision.

Dated as of the Entered on Docket date above.

_____
Hon. Karen A. Overstreet
United States Bankruptcy Judge

MEMORANDUM DECISION - 22